MILLIPORE CORPORATION, Plaintiff,

v.

UNIVERSITY PATENTS,
INC., Defendant.

Civ. A. No. 86–403–JRR.

United States District Court,
D. Delaware.

Sept. 21, 1987.

Douglas E. Whitney and Mary B. Graham of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Paul H. Heller and Steven J. Lee of Kenyon & Kenyon, New York City, of counsel), for plaintiff.

Jeffrey M. Weiner of Bayard, Handelman & Murdoch, Wilmington, Del. (Arthur M. Lieberman and David A. Kalow of Lieberman, Rudolph & Nowak, New York City), for defendant.

## MEMORANDUM OPINION

ROTH, District Judge.

This is a declaratory judgment action brought pursuant to 28 U.S.C. § 2201 by plaintiff Millipore Corporation (Millipore) for a declaratory judgment that United States patents 4,415,732 (the '732 patent) and 4,458,066 (the '066 patent) owned by defendant University Patents, Inc. (UPI) are invalid, unenforceable and have not been infringed by Millipore. UPI has countered this claim by filing a Motion to Dismiss or Transfer asserting that UPI never threatened Millipore with suit or gave it a "reasonable apprehension" of suit, a necessary jurisdictional element of a declaratory judgment action. In the alternative, UPI asks the Court to transfer this action to the Northern District of California where three suits involving the same two patents were filed by UPI and have recently been settled.

### I. *Background.*

UPI is the technology licensing agent for several major universities. It serves the important function of helping scientists, who work for universities, to commercialize their inventions. The two patents at issue are the result of work done at the University of Colorado, one of UPI's client universities, by Professor Marvin H. Caruthers and two former graduate students, Mark Matteucci and Serge Beaucage. The patents involve the construction of DNA fragments in the field of genetic engineering. The first patent outlines the methods by which the instruments or "gene machines" construct the DNA, and the second involves the special chemical reagents used by these machines.

Millipore is a Massachusetts corporation which was not originally involved in the synthesis of DNA but which began planning to expand into this area in 1985. Two companies, Applied Biosystems (ABIO) and SmithKline Beckman Corporation, had been licensed by UPI to use the technology set out in the '732 and '066 patents. ABIO was the lead licensee and the only one with the right to offer sublicenses. ABIO's position as a licensee, coupled with Millipore's interest in entering the field of genetic engineering, led Millipore to begin negotiations to acquire ABIO in the fall of 1985.

During the course of these negotiations, Millipore learned that both ABIO and UPI had a right to sue for infringement of the patents, that ABIO believed the patents to be valid, and that they intended to keep all others out of the market. Millipore also discovered that ABIO and/or UPI had sued three competing manufacturers of gene machines and of reagents for DNA synthesis for infringement. The suits were filed against American BioNuclear, Biosearch, Inc. and Biosyntech, Inc. and were eventually all consolidated before the Honorable William H. Orrick in the Northern District of California. The actions have since been concluded by consent judgments, admitting validity and infringement, and by the infringers taking sublicenses from ABIO.

The negotiations between Millipore and ABIO faltered in the fall of 1985. Consequently, Millipore set its sights on purchasing Genetic Design, a company which manufactured and sold systems and reagents for DNA synthesis and protein sequencing. These negotiations culminated with Millipore's acquisition of Genetic Design in Jan-

uary, 1986. This acquisition put Millipore in the position of potential defendant in a patent infringement suit based on the similarities between the '732 and '066 patents and the machines and chemicals being produced by Genetic Design.

Millipore expressed an awareness in Schedule 3.1(f) to the Genetic Design Purchase Agreement, that Genetic Design, and with it thereby Millipore, would probably be sued by UPI.[1] Millipore believed this to be true in spite of its relatively small sales in the market, about $600,000 per year, because one of the defendants in the California litigation, Biosyntech, had sales of less than $100,000 per year and yet was still considered enough of a threat to warrant being sued by UPI.

Millipore also became aware that other companies, operating in the DNA synthesis market, had received letters from UPI threatening them with suit for infringement of UPI's patents. Millipore did not receive one of these letters. However, at that time Millipore was considering investing in Applied Protein Technologies, Inc. (APT), and APT had received one of the letters. During the due diligence investigation of APT, representatives of Millipore were shown the letters from UPI which read in part:

> We intend to enforce our patent rights against any company which manufactures or sells stabilized dialkylamino phosphite reagents or machines which practice the phosphoramidite process....
>
> \*    \*    \*    \*    \*    \*
>
> The purpose of this letter is to put you on notice under the patent law, of our claim to, and rights in, this technology. When the present suits are concluded, we will be seeking redress from the inception of infringement, and treble damages for intentional infringement, of our patent rights by your Company.

According to information available to Millipore, APT did not make or sell the reagents or machines described in the letter. Robert Dishman, President of the MilliGen Division of Millipore, stated that he believed this letter was mistakenly sent to APT, rather than Millipore, because APT had been formed by one of the founders of Genetic Design. Dishman believed that UPI thought APT was carrying out this part of Genetic Design's business when, in fact, it was being carried out by MilliGen, the successor to Genetic Design. Millipore believed it would be sued by UPI once the mistake was discovered.

Millipore also learned that one of its customers, Professor Alex Nussbaum of Harvard Medical School, had been threatened with copyright infringement and unfair competition by ABIO. The threat was apparently the result of a comparison study, performed by Nussbaum, of the ABIO and Millipore gene machines in which the Millipore machine was described as being better in certain respects. Because of the favorable comparison, Millipore began using the study in its sales presentations.

Later that year, in June, 1986, at an Analytica Trade Show in Munich, Germany during which ABIO and Millipore were both demonstrating their competing machines, Elaine Heron, ABIO's representative at the Show, reiterated to Robert Dishman that ABIO intended to sue for alleged inaccuracies and misrepresentations in Professor Nussbaum's study. When pressed for specifics, Ms. Heron apparently pointed to only one inaccuracy, the model number of one of ABIO's machines. This mistake was subsequently corrected by Millipore.

While discussing the California litigation at the trade show in Germany, Dishman also asked Heron if ABIO intended to sue Millipore. It is disputed as to whether Heron's response was that ABIO intended to pursue any and all parties that infringed

1. Schedule 3.1(f) states:
    University Patents Inc. (UPI) has instituted several lawsuits claiming infringement of patents owned by them covering DNA synthesizers and chemical reagents. Certain specialized chemicals used in the AutoGen 6500 are the subject of a part of this litigation. Although Design has neither been sued nor threatened with suit by UPI, UPI has aggressively asserted its rights in this area. Thus, there appears to be a strong likelihood that a claim of infringement against Genetic Design will eventually be made by UPI.

its patents or whether she simply informed Dishman that the California litigation was still pending. Although this may not be a clear assertion of ABIO's intention, Dishman stated in his affidavit that he understood Heron's response to plainly mean that Millipore would be sued by ABIO.

Early in 1986 Millipore began considering acquiring Biosyntech GmbH (GMBH), a German specialty chemical manufacturer. At this point, UPI had already filed suit against GMBH as part of the California litigation. However, GMBH had never been served. Millipore knew this and realized that acquiring GMBH would put Millipore in even more serious jeopardy of being sued by UPI. In spite of this, the plans to purchase GMBH matured through the summer of 1986, and according to Geoffrey Nunes, Senior Vice President and General Counsel of Millipore, Millipore's apprehension of suit simultaneously intensified. Realizing that the California litigation was nearing settlement and fearful that Millipore would be sued next, this action was filed by Millipore on August 29, 1986. GMBH was later acquired by Millipore on December 9, 1986.

In January, 1987, in response to the filing of the Complaint in this case, ABIO offered Millipore a license in settlement of this action. Steven Lee, an attorney for Millipore, was told that the alternative to taking the license, which contained a provision for past damages, was litigation with UPI. On February 18, 1987, before UPI had responded to the Complaint, Millipore filed an Amended Complaint which included the offer of a license and the direct threat of litigation.

II. *Procedure.*

■ UPI has moved to dismiss this declaratory judgment action, pursuant to Federal Rule of Civil Procedure 12(b)(1), on the ground that the action lacks subject matter jurisdiction. The general rule in a motion to dismiss is that the Court accept as true all well-pleaded factual allegations in the complaint. *Enka B.V. of Ardhem, Holland v. E.I. DuPont,* 519 F.Supp. 356, 359 (D.Del.1981). However, there is a dis-

tinction between a 12(b)(1) motion which questions the subject matter jurisdiction of the Court and a motion to dismiss which attacks the allegations of the complaint on its face. Where the jurisdiction of the Court is being challenged—"its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen v. First Federal Savings & Loan Assoc.,* 549 F.2d 884, 891 (3d Cir. 1977). A dispute over material facts will not preclude the Court from making this determination. *Id.* Furthermore, it is plaintiff's burden to show that the Court does have subject matter jurisdiction. *Id.*

■ Since the Court must evaluate for itself the merits of the jurisdictional question, we are free to take into account all of the evidence submitted to the Court, rather than relying solely on the pleadings. *Enka,* 519 F.Supp. at 360. The evidence submitted in this case includes deposition testimony, affidavits, declarations and documents, all of which we may consider with the pleadings in making our determination. Activities that occurred subsequent to the filing of the Complaint may not be considered since jurisdiction, if it exists, must be established as of the date of the filing of the declaratory judgment action. *Jervis B. Webb Co. v. Southern Systems, Inc.,* 742 F.2d 1388, 1398 (Fed.Cir.1984).

III. *Declaratory Judgment.*

■ In order to maintain an action under the Declaratory Judgment Act there must be "a case of actual controversy." 28 U.S. C. § 2201; *Cutaiar v. Marshall,* 590 F.2d 523, 527 (3d Cir.1979). In other words, the statute itself is not a basis for jurisdiction; jurisdiction must be created independently of the statute. *Id.* Whether or not an actual controversy exists depends on the totality of the circumstances. *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *C.R. Bard v. Schwartz,* 716 F.2d 874, 880 (Fed.Cir.1983).

■ When a declaratory judgment is sought on the validity of a patent, an actual

232

justiciable controversy exists where: (1) "the defendant ... engaged in conduct that created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question" and (2) the plaintiff has actually produced or prepared to produce the accused device. *Jervis B. Webb,* 742 F.2d at 1398–99. Reasonable apprehension is determined on an objective, not subjective, basis. *Indium Corp. of America v. Semi–Alloys, Inc.,* 781 F.2d 879, 883 (Fed.Cir.1985).

■ The parties in this action do not dispute that the second element of a justiciable controversy in a declaratory judgment action has been satisfied by Millipore's manufacture and sale of machines and chemicals similar to those patented by UPI. The crucial question before the Court is whether UPI's conduct has been such that it caused Millipore to have an objectively reasonable apprehension of being sued by UPI at the time the declaratory judgment action was filed. We conclude that such a reasonable apprehension has been established by Millipore.

The combination of Millipore's acquisition of Genetic Design, ABIO's threats to Professor Nussbaum, Elaine Heron's statements to Robert Dishman at the trade show in Germany, the letters sent throughout the industry threatening suit to those who infringed UPI's patents, Millipore's negotiations to acquire and the eventual acquisition of GMBH, the California litigation which remained pending through the filing of this action, and ABIO's offer of a sublicense to Millipore—these factors, taken together, all establish that Millipore's apprehension of suit was not only real but objectively reasonable as well.

■ UPI asserts that none of the above occurrences constituted reasonable apprehension on Millipore's part because no threat of any kind was ever made by UPI or ABIO. UPI fails to realize, however, that the threat of suit for patent infringement does not have to be direct or specific. *Simmonds Aerocessories Ltd. v. Elastic Stop Nut Corp. of America,* 257 F.2d 485, 490 (3d Cir.1958); *Enka,* 519 F.Supp. at

365. Implication is sufficient. *Cosden Oil & Chemical Co. v. Foster Grant Co.,* 432 F.Supp. 956, 958 (D.Del.1977), *aff'd* 577 F.2d 725 (3d Cir.1978).

The implication behind the California litigation and UPI and ABIO's general statements and letters sent to the industry, indicating that they intended to enforce their patent rights against any company, was that Millipore was on their list of companies to be sued if they continued selling competing products. Millipore's negotiations to purchase GMBH, a company that had already been named in a suit by UPI, could only reinforce the apprehension. The implication of Heron's comments to Dishman at the trade show in Germany also seemed to be that Millipore would be sued if they continued operating in the field of DNA synthesis.

In *Dewey & Almy Chemical Co. v. American Anode,* 137 F.2d 68 (3d Cir. 1943), no direct threat to sue plaintiff was ever made. However, the Court found that jurisdiction existed because the owner of the patent had counted on its suit of another manufacturer to have an "in terrorem" effect on others, including the plaintiff Dewey & Almy. The patentee's suit of the first manufacturer was for infringement of a different infringing process, but the deterrent effect to other manufacturers was enhanced by a statement of defendant Anode's president in which he told plaintiff, Dewey & Almy, that Anode intended to "put a stop" to the infringement. *Dewey & Almy,* 137 F.2d at 69–70.

In *Cosden,* 432 F.Supp. 956, defendant Foster Grant offered a license to plaintiff's indemnitee, United States Steel (Steel), which included a provision for past damages. The Court found this offer of a license "amounted to a claim by Foster Grant that Steel, in its use of Cosden technology, had been infringing the '434 patent and that Foster Grant intended to enforce its right under the patent." *Id.* at 959. Such an implication along with specific claims of infringement against Steel, a Cosden licensee, and the eventual offer of a license to Cosden itself, also with a provision for past damages, were held by the

Court to be sufficient to create a reasonable apprehension by Cosden of being sued by Foster Grant.

■ ABIO's offer of a license to Millipore, given the background of events described in this opinion, would also make Millipore's apprehension of suit objectively reasonable. It is true that the offer of a license, alone, is not sufficient to create a reasonable apprehension on the part of the plaintiff. *Cosden,* 432 F.Supp. 956, 958. However, it is a factor to be considered in determining whether the totality of the circumstances indicates a reasonable apprehension. *Id.* at 958–59.

UPI argues that the offer of a license by ABIO is not even a factor in this suit because it occurred after the filing of the complaint and the reasonable apprehension must be established as of the date of the filing of the complaint. *See, Jervis B. Webb,* 742 F.2d at 1398. UPI's position would be correct if no amended complaint had been filed. However, Millipore did file an amended complaint, before any answer had been filed by UPI, and the date of the filing of this amended complaint, February 18, 1987, thereby becomes the controlling date for purposes of determining whether Millipore had a reasonable apprehension of suit.

The amended complaint included not only allegations of the offer of a sublicense but also a direct threat of litigation by UPI. Amended Complaint, ¶ 8. Such a direct threat is sufficient on its own to create a reasonable apprehension of suit on the part of Millipore. *See Enka,* 519 F.Supp. at 365. The text of the proposed sublicense agreement and a letter by James Kitch, an attorney for ABIO, in which the license was offered to Millipore, are part of the record in this case. Moreover, Steven Lee, counsel for Millipore, explained in a sworn Declaration that the alternative to accepting the sublicense was suit with UPI. Mr. Lee stated:

6. On January 5, 1987 James Kitch of Applied Biosystems called me with UPI's settlement offer. He told me the terms over the telephone, and promised to send the agreement shortly.... Several days later we spoke again by telephone.

7. During the course of those conversations, he told me that it was the same offer he was extending to anyone and everyone in the industry. He also told me that the offer was a take-it-or-leave-it. He was willing to license us at his rates, and equally willing to let us litigate the patent with UPI. He impressed upon me the idea that if we did not accept his offer, we would face litigation from UPI and or ABI[O].

UPI does not appear to dispute the offer of a sublicense or the substance of the telephone conversation between Kitch and Lee. The lack of evidence in the record to counter Millipore's factual assertions, along with UPI's failure to argue that they did not occur, lead us to only one conclusion—that ABIO offered Millipore a sublicense and that Millipore was threatened with suit if the offer was not accepted. These actions clearly establish the existence of an actual controversy between UPI and Millipore. UPI's actions towards Millipore and others make it very likely that anyone in Millipore's position would not only be apprehensive about the potential for being sued but would, in fact, be almost certain of becoming the target of litigation with UPI. For these reasons, UPI's motion to dismiss will be denied.

IV. *Motion to Transfer Venue.*

As an alternative to dismissal, UPI has moved to transfer this action to the Northern District of California, pursuant to 28 U.S.C. § 1404(a). Section 1404(a) states that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The phrase "where it might have been brought" has been interpreted to mean that the plaintiff must have had an "unqualified right" to bring the action in the transferee district at the time when suit was filed. *Shutte v. Armco Steel Corporation,* 431 F.2d 22, 24 (3d Cir.1970), *cert. denied* 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971). The plaintiff would not have an "unqualified right"

if a real question existed as to whether the action could have been brought in the transferee district. *Id.* at 25. In order for the instant action to have been brought in the Northern District of California, both venue and personal jurisdiction over the defendant must have been obtainable in California. *Id.* at 24.

### A. *Venue.*

■ Venue in a declaratory judgment action for patent invalidity is governed by the general venue statute at 28 U.S.C. § 1391(b), rather than the specific venue statute for patent infringement actions, 28 U.S.C. § 1400(b). *Pennwalt Corp. v. Hutton Co.,* 582 F.Supp. 438, 440 (E.D.Pa. 1984). Section 1391 provides that venue is proper where all the defendants reside or where the claim arose. Neither party suggests that UPI resides in California, so there must be a showing that the action arose in California. A declaratory judgment action seeking to invalidate a patent arises "where the alleged infringer is located, receives the damaging charges of infringement, or suffers economic injury as a result of the charges." *Pennwalt,* 582 F.Supp. at 440 (*citing, Eastman Kodak Co. v. Studiengesellschaft Kohle,* 392 F.Supp. 1152, 1157 (D.Del.1975)).

■ Under these standards, Millipore cannot be said to be located in California since it is a Massachusetts corporation with its principal place of business in Bedford, Massachusetts, and there is no evidence that it is licensed to do business in California. All of the Millipore employees who work in the DNA synthesis field are also apparently located in Massachusetts. As a result, the damaging charges of infringement would have been received in Massachusetts, and any economic injury would have occurred there as well.

UPI argues that the claim arose in the Northern District of California because the alleged threatening conduct by UPI was in California. While this may or may not be true, the source, as opposed to the place of receipt, of the charges of infringement is not a factor in determining where the claim arose. *See Pennwalt,* 582 F.Supp. at 440. Where the injury was suffered is a proper inquiry, but there is nothing in the record to suggest that this occurred anywhere in California. For these reasons, we find that venue in this action would not lie in California.

### B. *Personal Jurisdiction.*

Assuming, however, for the sake of argument that venue was proper in California, we still have serious doubts as to whether the California District Court could have obtained personal jurisdiction over UPI. UPI contends that personal jurisdiction would be no obstacle in California because: (1) Millipore could have intervened in the California litigation while it was pending; (2) Millipore could have sued ABIO in California; and (3) the California litigation provided enough of a nexus to permit UPI to be sued in California pursuant to the California long-arm statute, Cal. Code Civ.Pro. § 410.10.[2]

The first two reasons cited by UPI in support of personal jurisdiction involve actions by Millipore, not UPI. Whether or not Millipore could have intervened in the California litigation or whether it could have sued ABIO in California has no bearing on the issue of personal jurisdiction over UPI. It is the defendant, UPI, not the plaintiff, which must have sufficient contacts with the forum state. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980) ("It has long been settled, and we reaffirm today, a state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum State.")

■ UPI also claims that its involvement in the recently concluded infringement action in California was sufficient to bring it within the reach of the California

---

**2.** Section 410.10 provides:

A Court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.

long-arm statute and thus establish personal jurisdiction. California courts have expressly held that the California long-arm statute, Cal. Code Civ.Pro. § 410.10, permits courts to exercise jurisdiction to the fullest extent authorized under the due process clause of the United States Constitution. *Kransco Mfg. Co. v. Markwitz*, 656 F.2d 1376, 1377–78 (9th Cir.1981); *Belmont Industries, Inc. v. Superior Court*, 31 Cal. App.3d 281, 285, 107 Cal.Rptr. 237, 239–40 (1973). Thus, federal law is controlling in determining the scope of the California statute. *Kransco*, 656 F.2d at 1378.

Where personal jurisdiction is asserted over a non-resident defendant, the initial question to be asked is whether "the claim or cause of action which is being pursued arises from the defendant's forum related activities or from non-forum related activities." *Reliance Steel Products v. Watson, Ess, Marshall & Enggas*, 675 F.2d 587, 588 (3d Cir.1982). If the cause of action arises from forum related activity, then we must determine whether there are sufficient contacts with the forum arising out of that specific transaction. *Id.* If the cause of action arises from non-forum related activity, the plaintiff has the burden of showing that the defendant, in matters other than the claim being pursued, has maintained "continuous and substantial" forum contacts. *Schwilm v. Holbrook*, 661 F.2d 12, 14 (3d Cir.1981) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The later test for jurisdiction is much more difficult to meet in that the facts asserted by plaintiff to establish jurisdiction must be "extensive and persuasive". *Reliance Steel*, 675 F.2d at 589.

UPI's utilization of the courts of the United States District Court for the Northern District of California to file patent infringement suits against unrelated parties does not establish a basis for finding that the present cause of action grew out of UPI's activities in California. Although the earlier litigation involved claims of infringement of the same patent, it did not arise out of the same transaction. *Cf. Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith,*

*Inc.,* 564 F.Supp. 1358, 1371 (D.Del.1983) (Third party complaint against unrelated party for infringement of patent at issue in the litigation was dismissed on the ground that it did not arise from the same transaction.)

UPI claims, however, that, if we include the California litigation as a factor in establishing Millipore's reasonable apprehension of suit for purposes of subject matter jurisdiction, we cannot then find that this action did not arise from UPI's activities in California. The difficulty with this argument is that reasonable apprehension is only an element which had to be established in order for this Court to have jurisdiction to hear this case. The fact that subject matter jurisdiction may be partially established by UPI's actions in California does not mean that these jurisdictional facts are the same "transaction" from which the present cause of action arose.

Because we find that this claim arose from non-forum related activities, UPI must have had "continuous and substantial" forum affiliations in order for personal jurisdiction to attach in California. *Reliance Steel*, 675 F.2d at 588. There has been no showing of any UPI activity in California except the California litigation. This hardly meets the requirement of "extensive and persuasive" facts showing the continuous contacts.

Since neither venue nor personal jurisdiction could have been established in the Northern District of California, there is no question that UPI's motion to transfer this action should be denied.

The relative convenience of trying this case in California need not be analyzed once it has been determined that a failure to establish venue or personal jurisdiction would prevent the case from being brought in that district in any event. However, even if venue and personal jurisdiction had been established, we remain unconvinced that any showing by defendant that it would be more convenient for defendant, if this case were transferred to California, has risen to the level which could counterbalance the "paramount consideration" of

plaintiff's choice of forum. *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970).

UPI's motion to dismiss or transfer will be denied.